Clem H. Block v. Commissioner. Clem H. Block and Katherine L. Block v. Commissioner.
Block v. Commissioner
Docket Nos. 5281-69, 5307-69. Michigan.
United States Tax Court
T.C. Memo 1972-130; 1972 Tax Ct. Memo LEXIS 127; 31 T.C.M. (CCH) 579; T.C.M. (RIA) 72130; June 19, 1972
Clem H. Block, pro se, 136 Rio Verde St., Daly City, Calif.Charles S. Stroad, for the respondent. STERRETT
Memorandum Findings of Fact and Opinion STERRETT, Judge: In docket No. 5281-69, respondent *128 has determined deficiencies in Clem H. Block's Federal income tax and also penalties in the amounts indicated for the following years: Additions to the tax
Year
Tax
Sec. 6653(b) [1]
Sec. 6654
1956
$ 3,444.41
$ 1,722.20
$ 92.92
1957
27,672.58
13,836.29
770.86
1958
$ 44,019.89
$22,009.95
$1,036.06
1960
37,633.96
18,816.98
917.98
1961
8,617.27
4,308.64
189.23
$121,388.11
$60,694.06
$3,007.05
In docket No. 5307-69, respondent has determined deficiencies in Clem H. and Katherine L. Block's Federal income taxes 580 as well as penalties in the amounts indicated for the following years: Addition to tax,
Year
Tax
Sec. 6653(b)
1959
$2,591.42
$1,295.71
1962
3,039.19
1,519.60
$5,630.61
$2,815.31 A number of questions are presented for our decision: (1) Whether Clem H. Block filed Federal income tax returns for 1956, 1957, 1958, 1960, and 1961; (2) Whether Clem H. Block received income during the years in issue from his law partnership, his individual law practice, and as a result of his appropriating *129 the assets of a certain estate; (3) Whether respondent properly determined the amounts of petitioners' deductions for automobile expenses, business expenses, depreciation, interest, taxes, charitable contributions and dependency exemptions; (4) Whether any part of the underpayments, if any, for each of the years in issue was due to frand: (5) Whether petitioner Clem H. Block underpaid his estimated taxes for the years 1956, 1957, 1958, 1960, and 1961. Findings of Fact Clem H. Block (hereinafter referred to as Clem), petitioner in docket Nos. 5281-69 and 5307-69 and Katherine L. Block, petitioner in docket No. 5307-69, are husband and wife. At the time of filing their petitions herein petitioners resided in Grand Rapids, Michigan. Petitioners timely filed joint Federal income tax returns for the calendar years 1959 and 1962 with the district director of internal revenue, Detroit, Michigan. Respondennt's records of assessments and payments show no receipt of a Federal income tax return from Clem for the years 1956, 1957, 1958, 1960, and 1961. On July 23, 1969, respondent sent Clem a statutory notice concerning his Federal income tax liabilities for the years 1956, 1957, *130 1958, 1960, and 1961. In the notice it was asserted that Clem filed no income tax returns for these years. Respondent determined Clem's income on the specific item basis, allowed some specific deductions and also asserted additions to tax for fraud, and for failure to pay estimated taxes. Respondent's determination was as follows: 1956
1957
1958
1960
1961
Partnership income
$16,050.23
$14,607.31
$30,775.48
$39,925.22
$12,775.42
Other income
0
40,564.59
47,214.95
38,420.00
8,000.00
Professional income
0
0
0
0
6,079.87
Capital Gains
0
0
0
0
635.77
Less:
Itemized deductions:
Contributions
0
(56.59)
(1,649.88)
(10,224.24)
(1,730.00)
In terest
(529.74)
(393.53)
(372.52)
(327.93)
(304.27)
Taxes
(735.19)
(774.01)
(797.49)
(821.31)
(950.70)
Exemptions
(3,000.00)
(3,000.00)
(3,000.00)
(3,000.00)
(2,400.00)
Taxable income
$11,785.30
$50,947.77
$72,170.54
$63,971.74
$22,106.09
Also on July 23, 1969, respondent sent petitioners a notice of deficiency concerning their Federal income taxes for 1959 and 1962. In that notice respondent increased Clem's professional and interest income, asserted Clem realized *131 additional income by diverting funds from an estate of which he was administrator, and denied certain deductions as well as an exemption for Clem's mother-in-law. Additions to the tax were also asserted by respondent. Respondent's determination of income was as follows: 1959
1962
Income shown on return
$11,113.07
$ 8,481.92
Add:
Partnership income
(397.08)
0
Professional income
0
1,244.96
Other income
$ 1,743.00
$ 8,050.45
Interest income
0
330.00
Disallowed deductions:
Contributions
4,724.37
0
Interest
100.92
0
Business expenses
2,129.91
0
Disallowed exemption
0
600.00
Taxable income
$19,414.19
$18,707.33 Petitioners in their 1959 joint return deducted $7,225 for contributions; $451.60 for interest, and $2,129.91 for business expenses. The parties have agreed that Katherine L. Block is not liable for any fraud penalties that have been asserted for 1959 and 1962. It has also been agreed between the parties that Mrs. Block is not liable for any deficiencies for 1962 attributable to increases in other income and interest income as set forth above. During each of the years 1956 through 1960, and until September 30, 1961, Clem *132 was a practicing attorney and a member of the law firm of White & Block in Grand Rapids, Michigan. The firm was dissolved on September 30, 1961. The principal members of the firm were Clem H. Block and Gerald E. White. For each of the taxable years 1956 through 1960, and for the period ended September 30, 1961, the firm filed partnership returns of income with the district director of internal revenue, Detroit, Michigan. The returns were prepared by the firm's bookkeeper and signed by Gerald E. White. Prior to their being filed, the partnership returns were checked over by Clem. The amount of Clem's partnership income as reported on the White & Block partnership returns and as adjusted by respondent in the statutory notice is as follows: Year
Partnership
Statutory
Return
Notice
1956
$16,999.23
$ 16,050.23
1957
27,976.45
14,607.31
1958
26,578.78
30,775.48
1959
24,659.70
24,262.62
1960
36,794.38
39,925.22
1/1/61-
9/30/61
11,939.12
12,775.42
The parties agree that Clem's partnership income was properly adjusted upward to reflect $3,253.35 in attorney fees paid to Clem in 1960 but never entered into the records of the White & Block firm. *133 Subsequent to the dissolution of the firm of White & Block, Clem continued practicing law as a sole practitioner. Clem reported and respondent determined the following income as having resulted from Clem's business as a sole practitioner during the periods indicated: Individual
Statutory
Period
Return
Notice
10/1/61-
12/21/61
-0-
$ 6,079.87
1962
$13,708.15
14,953.11
During the periods in issue while Clem was a sole practitioner he utilized the following depreciable property: dictaphone, bookcase, file cabinet, desk, air conditioner, law books, car and carpet and lights. On his 1962 Federal income tax return, Clem took a depreciation deduction of $1,739.18 on account of these items. In redetermining Clem's income for 1962, respondent reduced the allowable depreciation to $494.22 by increasing the useful life of all the equipment involved. Throughout the years in issue Clem prepared tax returns for other persons. On July 16, 1957, John M. Van Splunter (sometimes hereinafter referred to as Van Splunter), a resident of Grand Rapids, Michigan, died and his estate was admitted to probate in the Probate Court for the County of Kent, Michigan. The sole *134 residuary beneficiary of the Estate of John Van Splunter (hereinafter referred to as the Estate) is Betty Shurmer. Clem was appointed as administrator C.T.A. of the Estate, and has remained in such capacity throughout the years here in issue. Early in 1961, Betty Shurmer consulted an attorney about the Estate. She complained that she had never been able to receive what she felt was adequate information from Clem concerning the management and status of the Estate. After her attorney made an investigation, principally of probate records, Betty Shurmer filed a petition in the probate court to start proceedings seeking an accounting from Clem, and his removal as administrator. On April 20, 1961, the certified public accounting firm of Kauffman, Hungerford & Co., Grand Rapids, Michigan, was retained at the request of Clem to do an accounting for the Estate. An accounting covering the period of July 16, 1957 through August 15, 1962 was prepared by Eugene R. Doorn of Kauffman, Hungerford & Co. Clem did not keep formal accounting records for the Estate, and did not follow any consistent practice when banking money received by the Estate. The accounting was formulated from an analysis of *135 bank 582 accounts presented to Doorn by Clem as being depositories of Estate funds, and from information supplied by Clem as to the nature of the items in the accounts. The accounting was filed with and allowed by the Probate Court for the County of Kent, Michigan. In the order allowing final account, dated October 31, 1962, the Probate Court determined that as of August 15, 1962, the Estate had an account receivable against Clem amounting to $106,423.99. The accounting reflects the following with respect to account receivable due from Clem: Increase
Year-end
Year
Collections
Disbursements
(Decrease)
Balance
1957
$ 33,884.22
$ 12,391.63
$ 21,492.59
$ 21,492.59
1958
341,370.98
200,461.02
140,909.96
162,402.55
1959
34,468.75
108,939.04
(74,470 .29)
87,932.26
1960
85,106.91
59,025.91
26,081.00
114,013.26
1961
14,132.92
22,377.64
(8,244.72)
105,768.54
1962
1,098.88
443.43
655.45
106,423.99 The account receivable for each year was determined by first computing the amounts of income or other funds collected for the Estate by Clem and deposited in the "White & Block-Trust Account" or in the "Clem H. Block-Trust Account. *136 "Then distributions made to the Estate's favor to creditors, legatees, or other bank accounts from the trust accounts were subtracted from the aggregate of deposits in the trust accounts attributable to the Estate. The balance was carried forward each year and added to collections made for the Estate; thus becoming part of the next year's account receivable computation. Subsequent to the preparation of the accounting by Kauffman, Hungerford and Co., the Probate Court determined that the account receivable due the Estate from Clem should be reduced by the amount of certain checks written by Clem to Trinity Lutheran Church. The amount of the checks totaled $43,000 and was determined to represent fiduciary fees allowable to Clem as a credit against the account receivable. The checks were written over the course of 3 years in the following annual total amounts: Year
Amount
1958
$ 500.00
1960
34,500.00
1961
8,000.00
As part of a settlement agreement between Clem and Betty Shurmer concerning the account receivable, Clem agreed to refund $35,000 to the Estate. Pursuant to this agreement, Clem executed a note payable to Betty Shurmer in the amount of $35,000 and *137 secured by a real estate mortgage. Insofar as the evidence presented reflects, the only payment on the note was made on October 1, 1964, in the amount of $2,700. In the order allowing the final account the Probate Court ordered Clem to assign all the property remaining in the Estate to Betty Shurmer, except for $500 to be retained in the administrator's checking account. On or about September 24, 1953, Van Splunter made an investment of an undisclosed amount in Tyler Mountain Memory Gardens, Inc., a Charleston, West Virginia cemetery corporation (hereinafter referred to as Tyler Mountain). The investment was represented by various certificates of indebtedness issued by Tyler Mountain. Robert M. Verdier (hereinafter referred to as Verdier), acting as trustee for the investors in Tyler Mountain's certificates of indebtedness, received dividends from Tyler Mountain and distributed them to the investors. Verdier paid dividends on Van Splunter's investments in the certificates of indebtedness to the Estate by a series of checks amounting to $5,220 in 1957 and $3,546 in 1958. Among the certificates of indebtedness issued by Tyler Mountain to Van Splunter was certificate number one. *138 Certificate number one was sold on April 17, 1958, to Charles R. Bone, who paid $8,400 for the certificate by means of a check for that amount drawn to the order of the "Estate of John M. Van Splunter, Deceased." On October 9, 1953, Van Splunter loaned $40,500 to Tyler Mountain. The loan was evidenced by a note on which there was an outstanding balance in the amount of $7,960 as of April 30, 1957. Tyler Mountain issued five checks aggregating $8,560 in payment of the outstanding balance and of interest in the amount of $600. All the checks were issued in 1957 and endorsed by Clem. The two earliest checks were made payable to Van Splunter and the later three to the Estate. During 1953, Van Splunter invested approximately $47,500 in Floral Lawn Memorial 583 Gardens, a cemetery corporation located in Battle Creek, Michigan (hereinafter referred to as Floral Lawn). Verdier acted as trustee for the various investors in Floral Lawn, and in that capacity received funds for distribution to Van Splunter. Such funds were distributed by Verdier by checks made out to the Estate during the years and in the amounts as follows: Year
Amount
1957
$3,822
1958
5,901
1959
1,743
1960
3,920
*139 Sometime prior to his death, Van Splunter had purchased 15 City of Los Angeles bearer bonds having a face value of $1,000 each. On May 4, 1961, Clem sold eight of the Los Angeles bonds for the amount of $8,360 to the brokerage firm of Hudson White & Co., Grand Rapids, Michigan. The return on this sale was accounted for in the Estate's probate proceeding. On or about November 2, 1962, Clem borrowed $13,000 from Joseph Gless, Caledonia, Michigan, and put up seven of the Los Angeles bonds as collateral. Joseph Gless, on December 17, 1962, sold the seven bonds posted as collateral through the brokerage firm of Merrill Lynch, Pierce, Fenner & Smith, Grand Rapids, Michigan for the net amount of $7,262.50. The accounting for the Estate prepared by Kauffman, Hungerford & Co. reflected only the eight Los Angeles bonds sold in 1961. Kauffman, Hungerford & Co. had no indication that the other seven were in existence. Additionally the accounting contains no indication of Van Splunter's investments in Tyler Mountain and Floral Lawn and no record of dividends, sale or return of investment with respect to these items. Neither the principal beneficiary of the Van Splunter Estate, nor her lawyer *140 knew of the existence of the cemetery investments and the Los Angeles bonds at the time the final accounting was filed and approved. The existence of the checks written to Trinity Lutheran by Clem was not discovered until after the accounting was filed with the Probate Court. The following chart reflects respondent's determination of income Clem derived from the Estate: 584 YEARS:
1957
1958
1959
"Account Receivable" due Estate at end
$ 21,492.59
$162,402.55
$ 87,932.26
of year:
Less: (a) Credits for fees allowed
0
(500.00)
0
(Checks to Trinity Lutheran)
(b) Balance at beginning of the year
0
(21,492.59)
(162,402.55)
Net amounts withdrawn from Estate
$ 21,492.59
$140,409.96
($74,470.29)
during year or (net repayments)
Adjustments for net repayments in:
1959
(74,470.29)
1960
( 8,419.00)
1961
(16,244.72)
Taxable income from account receivable
21,492.59
41,275.95
0
Add: Fees allowed (Checks to Trinity
0
500.00
0
Lutheran)
Less: Amount not asserted
0
(13,080.00)
0
Total taxable income based upon
$ 21,492.59
$ 28,695.95
0
probate accounting
Income received from assets not
accounted for in the Probate
Proceeding:
(a) Tyler Mountain Memory Gardens
13,780.00
11,946.00
0
(b) Floral Lawn Memorial Gardens
3,822.00
5,901.00
1,743.00
(c) City of Los Angeles Bonds
0
0
0
Total taxable income received from the
$ 39,094.59
$ 46,542.95
$ 1,743.00
Estate
*141 YEARS:
1960
1961
1962
"Account Receivable" due Estate at end
$114,013.26
$105,768.54
$106,423.99
of year:
Less: (a) Credits for fees allowed
(34,500.00)
(8,000.00)
0
(Checks to Trinity Lutheran)
(b) Balance at beginning of the year
(87,932.26)
(114,013.26)
(105,768.54)
Net amounts withdrawn from Estate
($ 8,419.00)
($16,244.72)
$ 655.45
during year or (net repayments)
Adjustments for net repayments in:
1959
1960
1961
Taxable income from account receivable
0
0
655.45
Add: Fees allowed (Checks to Trinity
34,500.00
8,000.00
0
Lutheran)
Less: Amount not asserted
0
0
0
Total taxable income based upon
$ 34,500.00
$ 8,000.00
$ 655.45
probate accounting
Income received from assets not
accounted for in the Probate
Proceeding:
(a) Tyler Mountain Memory Gardens
0
0
0
(b) Floral Lawn Memorial Gardens
3,920.00
0
0
(c) City of Los Angeles Bonds
0
0
7,262.00
Total taxable income received from the
$ 38,420.00
$ 8,000.00
$ 7,917.45
Estate 585 This schedule, and the figures listed in it, are based upon respondent's requested findings of fact. The amounts asserted in the statutory notices differ in certain respects. *142 To the extent that the asserted amounts in the notices exceed the amounts in respondent's requested findings, we take the difference as having been conceded by respondent. Additionally, the statutory notice sent Clem puts the 1958 account receivable due the Estate at $28,695.95 and not $41,775.95. Respondent, in his brief, states that the difference is not being asserted. Accordingly the chart reflects this downward adjustment. The records of the Trinity Lutheran Church reflect contributions by the petitioners to the church's building fund for the years and in the amounts as follows: Year
Amount
1959
$1,014.13
1960
9,401.74
1961
300.00
1962
400.00
As early as June 1958 and through 1961, Clem owned a 1957 Chrysler Imperial automobile, which he drove 65,756 miles during that time. For each of the years 1956 through 1961 respondent allowed Clem a deduction for automobile expenses in the amount of $949 per year. On January 20, 1961, Clem placed in escrow the amount of $1,100 regarding a real estate transaction by Harry and Doris Wells. When examining a title abstract for the Wells', Clem had failed to discover an outstanding mortgage. The existence of the *143 mortgage was discovered when the Wells' attempted to sell the property. The escrow was established to cover any loss they might sustain if the mortgage was asserted. Clem hoped that the statute of limitations would run on the mortgage and that he would get his money back. The money as yet remains in escrow. Respondent's records of assessments and payments show no receipt of a Federal estimated tax return from Clem for the years 1956 and 1957. These same records show that petitioners filed an estimated tax return for 1958, and made the following payments on account of 1958 estimated tax on the dates indicated: Date
Amount
4/28/58
$1,203.34
6/11/58
1,203.34
9/22/58
1,203.33
1/26/59
1,203.34 According to respondent's records, petitioners filed an estimated tax return for 1960, and made the following payments on account of 1960 estimated tax on the dates indicated: Date
Amount
4/15/60
$810.74
6/27/60
810.74
9/23/60
810.74
1/26/61
810.75 Finally, respondent's records show that petitioners filed an estimated tax return for 1961, and made one payment of estimated tax for that year in the amount of $920 on September 18, 1961. In the statutory *144 notice respondent credits Clem with the payment as of June 15, 1961. Opinion The first question to be dealt with is whether Clem filed Federal income tax returns for the years 1956, 1957, 1958, 1960 and 1961. Clem testified that he did file for these years. Respondent has put in evidence his records of assessment and payments concerning the petitioners during the years in issue. These records show the receipt of no Federal income tax return from Clem for the years 1956, 1957, 1958, 1960 and 1961. Clem did not corroborate his testimony with any items such as retained copies of returns, cancelled checks showing payments, or certified or registered mail receipts. In this regard it is significant to note that the respondent's records show that petitioners filed estimated tax returns for the years 1958, 1960, and 1961. Clem was able to put in evidence his retained copies of the estimated tax returns for 1958 and 1960, and a check indicating a payment of $920 on the estimated tax for 1961. The only documentary evidence submitted by Clem in support of his testimony was a copy of a Form 1040 for 1956 and a copy of a Form 1040 for 1961. Both forms have notations and numbers written on *145 them in pencil. Clem submitted the forms as being his "work copies" and as being all he had available because he could not find his returns. Clem also sought to corroborate his testimony with the testimony of his wife. Mrs. Block testified that she did not know a year in which the Blocks did not pay their income taxes. However, her testimony reveals that she did not participate in preparing any returns, nor is there any indication that she signed any returns. She also said "I saw the estimate sometime and I usually wrote the check." Thus it appears that Mrs. Block might well be talking about the estimated tax returns which were filed. 586 Our observation of the witnesses on the stand and analysis of the evidence on this point convinces us that Clem did not file Federal income tax returns for the years 1956, 1957, 1958, 1960 and 1961. Since Clem did not file income tax returns for these years, the statutory period for assessments and collection has not run, and under section 6501 [2] the years are still open for consideration. *146 Next we turn to the question of whether respondent's determination of income for each of the years in issue is correct. Although there is a fraud question in this case, for which respondent has the burden of proof, petitioners nonetheless have the usual burden of overcoming the presumptive correctness of the deficiencies in income determined by respondent. Price v. United States, 335 F. 2d 671, 677, 678, (C.A. 5, 1964). Considering the size of the potential tax liabilities involved, the poor quality and small quantity of evidence submitted by petitioners is really quite astounding. The difficulties created by this paucity of evidence have been somewhat compounded by respondent because he essentially relies upon the presumptive correctiveness of his determination as far as such presumption could possibly go, and then supplies barely enough, and in one instance not quite enough, evidence to sustain him beyond that point. First to be considered is the amount of income earned by Clem while practicing law as a member of a partnership. During 1956 and up through September 30, 1961, Clem was a partner in the law firm of White & Block. During all the years Clem was a member, *147 the firm filed partnership returns of income. Clem examined all these returns before they were filed. In response to a question by the Court during the trial of this matter, Clem stated that the returns accurately reflected his share of partnership income. In determining Clem's partnership income respondent made adjustments to the amounts reflected in the partnership returns. Clem questions only two of these adjustments. Respondent reduced Clem's partnership income each year on account of automobile expenses at a rate of $949 each year. Clem claims he incurred expenses greater than the amount allowed by respondent. The only evidence offered in support of this claim was a group of 5 x 8 cards constituting a service record for a 1957 Chrysler Imperial automobile. This evidence merely demonstrates that Clem possessed a car which was regularly serviced and repaired, and in no way supports a conclusion that the car was used for business. Accordingly, respondent's determination that Clem incurred deductible automobile expenses at the rate of $949 per year is sustained. In 1961 Clem placed $1,100 in escrow to cover a possible loss by a client to whom Clem had given an erroneous real estate *148 title opinion. When the money was placed in escrow, Clem hoped to let the statute of limitations run on any claim that could be made against his client, and then get the money back. Under these circumstances it cannot be said that the money placed in escrow constituted a business expense deductible in 1961. See Richard M. Drachman, 23 T.C. 558, 562 (1954). Viewing all the evidence, and keeping in mind that the burden of proof is on the petitioners, we conclude that respondent correctly determined the amount of Clem's partnership income for the period of 1956 through September 30, 1961. Next to be considered are the amounts earned by Clem from his individual practice of law. Other than his contention, dealt with above, that respondent understated automobile expenses, Clem challenges respondent's determination of income from the individual practice of law in only one respect. Clem alleges that he is entitled to depreciation deductions aggregating $1,739.18 for 1962, rather than $494.22 as allowed by respondent. No contentions 587 whatsoever have been made by Clem concerning depreciation for 1961. In support of his claim of higher depreciation, Clem asserted that *149 some of the property subject to depreciation was used. The only evidence for this contention is Clem's obscure testimony which we find wholly insufficient. Consequently, and considering all the evidence, we find that respondent correctly determined the income Clem earned from the individual practice of law in 1961 and 1962. Next we must consider whether Clem diverted funds from the Estate of John M. Van Splunter, of which Clem was the administrator, so that the funds constituted income to Clem during the years in issue. The general rule governing this question is succinctly stated in Rutkin v. United States, 343 U.S. 130 (1952) where the Supreme Court stated: An unlawful gain, as well as a lawful one, constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it. See also, James v. United States, 366 U.S. 213, 219 (1961); Davis v. United States, 226 F. 2d 331, 334-5 (C.A. 6, 1955). Whether a taxpayer has appropriated funds to his own use and economic benefit so that they are income to him is a question of fact to be determined by the trial court. *150 Dawkins v. Commissioner, 238 F. 2d 174, 178 (C.A. 8, 1956). Allegedly one source of diverted funds is indicated by the existence, during some of the years in issue of a net account receivable due to Estate from Clem. The account receivable was set up in a final accounting prepared for the Estate by Kauffman, Hungerford & Co., after the principal beneficiary of the Estate petitioned for a final accounting and for removal of Clem as administrator. The final accounting sought to introduce some order into the chaos created by Clem's inadequate accounting and bookkeeping procedures. The account receivable essentially represented the difference between funds of the Estate collected by Clem and deposited in his attorney trust accounts, and disbursements from the attorney trust fund accounts in favor of the Estate. Attorney trust accounts are commonly established by practicing attorneys as depositories for funds belonging to clients or others which are temporarily in their possession. Attorneys are fiduciaries with respect to funds in their trust accounts, and may not use them as their own. [3] The mere fact that petitioner deposited funds of the Estate in his attorney trust *151 account does not indicate he exercised such domination and control over the funds that we can conclude the funds were being used for Clem's economic benefit and thus constituted income to him. It is also worthy of note that Clem not only made deposits of Estate funds into the attorney trust accounts, but also made disbursements from the trust accounts in favor of the Estate, and indeed these disbursements, in 2 years, far exceeded deposits. *152 The evidence which traces the funds constituting the account receivable into Clem's attorney trust accounts is the Estate's final accounting prepared by Kauffman, Hungerford & Co. This jointly submitted exhibit was evidence available to petitioner as well as respondent. Since the accounting operates to rebut the presumption in respondent's favor that the net account represented income to Clem, it was respondent's duty to go forward and show by cogent evidence that, nonetheless, Clem had such complete domination over the funds that he realized the actual economic benefit of the property. No such evidence was tendered in this proceeding. Consequently we must conclude, on the record before us, that the net accounts receivable allegedly due from Clem to the Estate in 1957, 1958, and 1962 do not constitute income for Clem in those years. 588 Subsequent to the preparation and filing of the Estate's final accounting it was discovered that Clem had written a series of checks against Estate funds in favor of Trinity Lutheran Church. The checks amounted to $500 in 1958, $34,500 in 1960, and $8,000 in 1961. Respondent included these amounts in Clem's income for the years indicated. The *153 probate court, in its order allowing the final account, applied the aggregate amount of the checks as a reduction of the account receivable allegedly due from Clem, and determined that the amounts represented the payment of administrator fees to Clem. The evidence supports the conclusion that Clem wrote the checks to Trinity Lutheran Church in the amounts and years indicated. There is no evidence as to the purpose of the checks and what ultimately happened to the money. All the record shows is that Clem took the money out of the Estate. Respondent contends that in so doing Clem treated the funds as his own and thus the amounts in question must be charged to him as income. As we have implied here, there is no evidence to rebut respondent's assertions. And there is certainly not the slightest sign that the amounts represent charitable contributions, nor does Clem so contend. We do not know what Clem was doing when he wrote the checks to Trinity Lutheran, but it was his duty to tell us. Also, when we recall that the final accounting was based upon information supplied by Clem, it is significant that the existence of the checks was not discovered until after the accounting was filed. *154 Considering the record such as it is, we must hold that respondent correctly included the amounts of the Trinity Lutheran checks in Clem's income. Prior to his death Van Splunter invested in two cemetery corporations, Tyler Mountain and Floral Lawn. After Van Splunter's death these investments continued to pay dividends which were collected by Clem. Additionally Clem sold one of the Tyler Mountain certificates of indebtedness, and also collected the outstanding balance and interest due on another loan to Tyler Mountain. None of these items realized from Van Splunter's cemetery investments appeared in the final accounting approved by the probate court, and Kauffman, Hungerford & Co. was not aware of them. Respondent included the amounts of dividends, sales proceeds, return of capital and interest in Clem's income for the years when collected. These items are on a par with the Trinity Lutheran checks in that the evidence supports a conclusion that the funds traveled into Clem's hands and were subject to his complete domination and control. No evidence points to a contrary conclusion, and Clem's apparent failure to disclose these items at the time of the final accounting only lends *155 credence to respondent's determination. Thus we sustain respondent's inclusion of these items in Clem's income. The final item of diversion of income involves seven City of Los Angeles bearer bonds. At the time Van Splunter died he owned 15 City of Los Angeles bearer bonds. The final accounting reflected only eight of the bonds. The accountants from Kauffman, Hungerford & Co., relying on information provided by Clem, did not know the other seven were in existence. On or about November 2, 1962, only 2 days after the final accounting was allowed by the probate court, Clem borrowed $13,000 posting the seven unaccounted for bonds as collateral. On December 17, 1962, the lender sold the seven bonds for $7,262.50. Respondent included this amount in Clem's 1962 income, and in doing so was clearly correct. Clem, in using the bonds as collateral, diverted them to his own use and realized a clear economic benefit. Before we can finally determine petitioner's income for the years in issue we must address ourselves to some additional questions concerning itemized deductions, exemptions, and income. Respondent, in the statutory notice concerning the years 1956, 1957, 1958, 1960 and 1961, *156 asserted that Clem realized capital gains of $635.77 in 1961, and, in the notice concerning the years 1959 and 1962, asserted that petitioners realized interest income of $330 in 1962. Beyond the pleadings the parties have made no reference to these items. In this requested findings of fact respondent included a chart in which he recapitulated in tabular form his determination of income for petitioners. The schedule, which has as the final figure in the column for each year in issue an amount designated "Total taxable income received by petitioners," does not include the capital gains and interest items. Accordingly we take it that respondent has conceded these items. The only evidence concerning charitable deductions is that petitioners contributed 589 the following amounts in the years indicated: Year
Amount
1959
$1,014.13
1960
9,401.74
1961
300.00
1962
400.00 Thus it is appropriate to sustain the charitable contribution deductions determined by respondent all of which were in excess of the amounts proved by petitioners. The notice for 1956, 1957, 1958, 1960 and 1961 determined Clem's deductions for interest and taxes. Clem has not contested the amounts *157 determined and accordingly they are sustained. The same applies to respondent's determination of the interest and taxes deductions for 1959. The notice for 1959 and 1962 disallowed a deduction of $2,129.91 in alleged business expenses. The bulk of this involved automobile expenses which were dealt with above, and the balance was very simply not brought into contention by petitioners. So respondent's disallowance of this deduction must be approved. Clem claims he is entitled to a dependency exemption on account of his mother-in-law for 1961 and 1962. It has not been demonstrated that Clem provided over one-half the support of his mother-in-law during 1961 and 1962. Section 152(a). Consequently, respondent's determination in this regard is correct. Consistent with the foregoing, we determine that the unreported taxable income of Clem or the petitioners, as the case may be, for each of the years in issue is as follows: 590 1956
1957
1958
Income: Partnership
$16,050.23
$14,607.31
$30,775.48
Individual Practice
0
0
0
Van Splunter Estate: Tyler
0
13,780.00
11,946.00
Mountain
Floral Lawn
0
3,822.00
5,901.00
Trinity Lutheran Checks
0
0
0
Los Angeles Bonds
0
0
0
Total
$16,050.23
$32,209.31
$48,622.48
Less: Itemized deductions and
0
56.59
1,649.88
exemptions Contributions
Interest
529.74
393.53
372.52
Taxes
735.19
774.01
797.49
Deductions on returns not
0
0
0
redetermined
Exemptions
3,000.00
3,000.00
3,000.00
Taxable Income
11,785.30
27,985.18
42,302.59
Less: Taxable Income shown on
return
Unreported Income
$11,785.30
$27,985.18
$42,802.59
*158 1959
1960
1961
1962
Income: Partnership
$24,262.62
$39,925.22
$12,775.42
$ 0
Individual Practice
0
0
6,079.87
14,953.11
Van Splunter Estate: Tyler
0
0
0
0
Mountain
Floral Lawn
1,743.00
3,920.00
0
0
Trinity Lutheran Checks
0
34,500.00
8,000.00
0
Los Angeles Bonds
0
0
0
7,262.00
Total
$26,005.62
$78,345.22
$26,855.29
$22,215.11
Less: Itemized deductions and
2,500.63
10,224.24
1,730.00
0
exemptions Contributions
Interest
350.68
327.93
304.27
0
Taxes
0
821.31
950.70
0
Deductions on returns not
740.12
0
0
2,226.23
redetermined
Exemptions
3,000.00
3,000.00
2,400.00
2,400.00
Taxable Income
19,414.19
63,971.74
21,470.32
17,588.88
Less: Taxable Income shown on
11,113.07
8,481.92
return
Unreported Income
$ 8,301.12
$63,971.74
$21,470.32
$ 9,106.87 591 Now we turn to the question of whether or not respondent properly applied the addition to the tax for fraud [4] to the deficiencies in issue. The burden of proof for this issue rests upon the respondent.[5] This Court will not presume the existence of fraud; rather fraud must be established by clear and convincing evidence. And the *159 question of fraud with intent to evade tax is a factual one to be determined upon a consideration of the whole record. Anson Beaver, 55 T.C. 85, 92 (1970). Thus we are to evaluate all the evidence properly before us, including the conduct of Clem and the conduct of his business affairs. Foster v. Commissioner, 391 F. 2d 727, 733 (C.A. 4, 1968). In this case it bears emphasis that the addition to tax for fraud applies when "any part" of the underpayment is due to fraud. Clem did not file returns for 5 of the 7 years in issue. The addition to tax for fraud may be imposed where a taxpayer has attempted to evade tax by a *160 willful failure to file returns, as well as when he has filed intentionally false returns. Stoltzfus v. United States, 398 F. 2d 1002 (C.A. 3, 1968), affirming 264 F. Supp. 824 (E.D. Pa., 1967); Fred N. Acker, 26 T.C. 107 (1956). However, willful failure to file without more does not in itself establish the existence of fraud. Stoltzfus v. United States, supra.In this case, there is no doubt that more is present. The salient feature of this case is a consistent occurrence of substantial unreported income for each of the years in issue. A consistent failure to report substantial amounts of income over a span of years, by itself, is highly persuasive evidence of an intent to defraud. Holland v. United States, 348 U.S. 121 (1954); Kurnick v. Commissioner, 232 F. 2d 678, 681 (C.A. 6, 1956); John Harper, 54 T.C. 1121, 1139 (1970). Additionally, we take into consideration the fact that during the years in issue Clem was a practicing attorney and certainly would at least know that returns had to be filed and taxes paid. While practicing in a partnership, Clem always saw the annual partnership *161 return of income and was thus informed as to his earnings from that source. That Clem filed income tax returns for 2 of the years in issue and also filed estimated tax returns and paid estimated taxes for some of the years in issue indicates an awareness that taxes had to be paid and returns filed. So also does the fact that Clem prepared returns for other people. It is significant that a substantial portion of the unreported income represents funds diverted from the Van Splunter Estate, and that Clem not only failed to reveal his depredations at the time of the accounting, but shortly thereafter diverted even more funds in the form of Los Angeles bonds. That Clem would resort to such deceitful methods to acquire income is a further indication that his failure to report the income for purposes of Federal taxation was due to fraud. Commissioner v. Smith, 285 F. 2d 91, 98 (C.A. 5, 1960), affirming a Memorandum Opinion of this Court. Our examination of the evidence leads us to hold that respondent has proven by clear and convincing evidence that Clem understated or failed to report income for each of the years 1956 through 1962 because of fraud with the intent to evade *162 tax. Accordingly, the imposition of the addition to tax for fraud for each of the years in issue is sustained. Additionally, the years 1959 and 1962 remain open for assessment and collection because the returns filed for those years were false or fraudulent with the intent to evade tax. Respondent determined that Clem was liable to additions to the tax for failure to pay estimated taxes in the years 1956, 1957, 1958, 1960 and 1961. [6] The penalty is mandatory and extenuating circumstances are not 592 relevant. Estate of Barney Ruben, 33 T.C. 1071 (1960). Clem has not shown he is within any of the exceptions provided for in the statute. Accordingly, respondent's determination is sustained to the extent of the deficiencies here determined. *163 In accordance with the foregoing, Decisions will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
2. Sec. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (a) General Rule. - Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) * * * and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. * * * (c) Exceptions. - (1) False Return. - In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time. * * * (3) No Return. - In the case of failure to file a return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time.↩
3. See, 7 Am. Jur. 2d Attorneys at Law, secs. 35, 36; Bogert, Trusts and Trustees, secs. 22, 481; The Code of Professional Responsibility of the American Bar Association provides: CANON 9. A LAWYER SHOULD AVOID EVEN THE APPEARANCE OF PROFESSIONAL IMPROPRIETY Ethical Considerations * * * EC 9-5 Separation of the funds of a client from those of his lawyer not only serves to protect the client but also avoids even the appearance of impropriety, and therefore commingling of such funds should be avoided. * * * Disciplinary Rules * * * DR 9-102 Preserving Identity of Funds and Property of a Client. (A) All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein * * *.↩
4. SEC. 6653. FAILURE TO PAY TAX. * * * (b) Fraud. - If any part of any underpayment * * * of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * * ↩
5. SEC. 7454. BURDEN OF PROOF IN FRAUD, FOUNDATION MANAGER, AND TRANSFEREE CASES. (a) Fraud. - In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Secretary or his delegate.↩
6. SEC. 6654. FAILURE BY INDIVIDUAL TO PAY ESTIMATED INCOME TAX. (a) ADDITION TO THE TAX. - In the case of any underpayment of estimated tax by an individual, except as provided in subsection (d), there shall be added to the tax under chapter 1 and the tax under chapter 2 for the taxable year an amount determined at the rate of 6 percent per annum upon the amount of the underpayment * * * for the period of the underpayment * * *.↩